## POOLE FOUNDRY & MACHINE CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 6310.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 9, 1951.

Decided Nov. 14, 1951.

Wyche, J., dissented.

John H. Herold, Baltimore, Md. (John H. Hessey and John H. Hessey, IV, Baltimore, Md., on the brief), for petitioner.

Frederick U. Reel, Atty., National Labor Relations Board, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Henry Geller, Atty., National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and WYCHE, District Judge.

DOBIE, Circuit Judge.

This is a petition by Poole Foundry and Machine Company (hereinafter called Poole) to set aside an order of the National Labor Relations Board (hereinafter called the Board) and the Board has requested enforcement of its order.

On November 27, 1946, a consent election was held at the Poole plant, as the result of which the Union, International Association of Machinists, was certified as the bargaining representative for Poole's employees in the unit involved. Thereafter, as a result of bargaining negotiations between Poole and the Union, a one year collective bargaining contract was entered into on April 16, 1947. When that contract expired, Poole and the Union, on May 19,

1948, after further collective bargaining, entered into a second contract which had expired by May 2, 1949. Thereafter, although bargaining between Poole and the Union continued, no new contract was ever entered into.

On May 9, 1949, the Union filed charges against Poole with the Regional Director, which Poole emphatically denied. Among other things, Poole was charged with the discriminatory discharge of certain employees on account of their Union activity. Although these charges were before the Regional Director from May, 1949, to December, 1949, and were duly investigated by the Regional Director's Field Examiner, Marie A. Pierce, yet no formal complaint was ever filed against Poole by the Regional Director as a result of these charges. On December 27, 1949, however, Poole and the Union entered into an agreement of settlement which was approved by the Regional Director of the Board on December 28, 1949. The charges of the Union were withdrawn and the files of the Regional Director were closed.

The settlement agreement included the standard clause that petitioner would not interfere with its employees in the exercise of their rights under Section 7 of the Act, 29 U.S.C.A. § 157. It further specifically provided that the Company would "bargain collectively upon request with the above-named union (Lodge 211) as the exclusive representative of all employees in the bargaining unit described herein with respect to rates of pay, hours of employment or other conditions of employment, and if an understanding is reached, embody such understanding in a signed statement."

Subsequent to the settlement agreement, in February, 1950, Poole and the Union engaged in collective bargaining conferences, though no agreement was reached. In the meantime, however, and on March 9, 1950, some ten months after the expiration of the last contract between Poole and the Union, Poole's employees—64 out of 66 of them in the bargaining unit involved—filed a petition with the Regional Director of the National Labor Relations Board (Board Case No. 5-RD-42), requesting that the Union be decertified on the ground that it was no longer their representative as defined in Section 9, subsection (a) of the National Labor Relations Act, as amended, 29 U.S. C.A. § 159(a). The intended action of its employees was intimated to Poole by a committee of its employees a few days before the petition was filed. Thereafter, Poole was officially notified, by letter dated March 15, 1950, from the Regional Director, that the contemplated action had been taken and the petition filed.

At its next bargaining conference with the Union on April 10, 1950, Poole took the position that in view of the pendency of the decertification petition, it would not bargain with the Union unless and until the latter furnished proof that it actually represented a majority of the employees. On April 19, 1950, the Regional Director notified the parties that he was dismissing the decertification petition; this dismissal was appealed to the Board which, on May 12, 1950, sustained the Director on the ground that the "employer and the IAM are entitled to a reasonable time within which to effectuate the provisions of the settlement agreement executed in Case No. 5-CA-194 free from rival claims and petitions, which reasonable time has not yet elapsed." Despite this final dismissal of the decertification petition, Poole continued to refuse to bargain with the Union, on the ground that the Union had not proved its status as majority representative of the employees.

In June, 1950, the Union filed charges with the Regional Director of the Board, setting out Poole's refusal to bargain. The Regional Director duly issued his Complaint, resulting in the Board's order that is now before us. In this order, dated July 9, 1951, the Board directed Poole, its officers, agents, successors and assigns, (1) to cease and desist from (a) refusing to bargain collectively with Lodge 211, International Association of Machinists, and (b) interfering with the efforts of the said Union to bargain collectively with the said Poole, and (2) to take certain affirmative action by (a) bargaining collectively with the Union, upon request, (b) posting copies of a certain notice at its Baltimore, Maryland, plant, and (c) notifying the Regional Director for the Fifth Region, National La-

bor Relations Board, of its compliance with the Board's said order.

Upon the foregoing facts the Board concluded that Poole's refusal to bargain with the Union violated Section 8(a), (5) and (1) of the Act, 29 U.S.C.A. § 158(a) (1, 5). Since Poole freely entered into the settlement agreement in return for the withdrawal of the charges against it, and since Poole in that settlement agreed to bargain with the Union, the Board concluded that the bargaining provision of the settlement agreement, like a similar provision in a Board order remedying unfair labor practices, must be given a reasonable time to operate, irrespective of any possible or proved loss of Union majority during such reasonable period. The Board further concluded that the three-and-one-half months which elapsed between the execution of the settlement agreement and the refusal to bargain was not such a reasonable period, and that Poole was therefore precluded from questioning the representative status of the Union.

The law appears to be well settled that if the Union's original unfair labor practice charge had led to a regular Board proceeding culminating in a finding by the Board that the employer had been guilty of an unfair labor practice and in a Board order directing the Company to bargain with the Union, the Company's duty to bargain for a reasonable period would have been unaffected by the filing of the decertification petition or by the Union's loss of majority. N. L. R. B. v. Tower Hosiery Mills, 4 Cir., 180 F.2d 701, 706, certiorari denied, 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596, and cases there cited. It is even clearer that ordinarily, in the absence of an unfair labor practice or of a remedial order, Poole would have been well within its rights in refusing to bargain with a Union whose majority status Poole questioned in good faith. The narrow question presented in this case is what effect, if any, is to be given to the settlement agreement under which Poole agreed to recognize its bargaining obligation to the Union in return for the withdrawal of the charge against it. The Board concluded that under the settlement agreement the parties must bargain for a reasonable time irrespective of fluctuations in the Union majority, and that such a reasonable time after the settlement agreement had not elapsed. Poole's contention is that in spite of the bargaining provision of the settlement agreement, it here had the right to question the Union's lack of a majority, and that, when 64 out of 66 employees in the bargaining unit manifested their desire not to be represented by the Union, Poole could properly refuse to deal with the Union since the Union was not the majority representative of the employees.

The manifest importance of these settlement agreements in the field before us can be gleaned from the fact that between 1936 and 1947 over 16,000 unfair labor practice charges (over one-third of the total number filed during the period) were settled before formal action (N. L. R. B., Twelfth Annual Report (1947), pp. 86–87.) As stated by the Attorney General's Committee on Administrative Procedure (1941), p. 13: "Probably over 90% of the matters coming before administrative agencies are disposed of informally with the acquiescence of the private interest affected and no formal trial proceedings. This must be so or government could not function. * * * In the first four years of its existence the National Labor Relations Board closed 12,227 cases, in only 8% of which was it necessary to go to formal proceedings. * * * The committee recommends that agencies which bring proceedings for the discontinuance of practices prohibited by law employ the informal methods used by the National Labor Relations Board, * * * to obtain in appropriate cases discontinuance by agreement without issuing complaints * * *."

We agree with Poole's contention that a settlement agreement differs from a finding by the Board that an unfair labor practice has been committed. We agree, too, with the Board's contention that a settlement agreement must, from its terms, have definite legal effect and is quite different from a dismissal of the charges. Our problem is to determine what force and effect must be given to such agreements. Oddly enough, there seems to be no report-

ed case decided by any federal court which passes directly on our problem.

We think the settlement agreement clearly manifests an administrative determination by the Board that some remedial action is necessary to safeguard the public interests intended to be protected by the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. (hereinafter called the Act.) It is equally clear that the settlement agreement represents an agreement by Poole to undertake promptly the remedial action set out in the agreement rather than to be put to the trouble and expense of litigation before a trial examiner, the Board and possibly the courts.

Experience has demonstrated the importance of the settlement agreement in the effective administration of the Act. There is manifest force in the Board's assertion that the contention of Poole would seriously undermine the effectiveness of settlement agreements as a satisfactory means of closing cases involving charges of unfair labor practices prohibited by the Act. There would indeed be few of these agreements if Poole, after a solemn promise to bargain with the Union, could immediately escape this obligation by questioning whether the Union actually represents a majority of the employees in the bargaining unit.

If Poole's contention be sound, this would permit an employer to commit an unfair labor practice by refusing to bargain collectively with the Union, sign a settlement agreement undertaking to bargain with the Union, then attempt to have a new union certified when dissatisfaction with the old union arose among the employees because of the unfair labor practice. Certainly this should neither be permitted nor encouraged.

■■ We, accordingly, agree with the Board's contention that Poole, by entering into the settlement agreement, thereby securing a withdrawal of the charges of unfair labor practices, is bound to bargain in good faith with the Union for a reasonable period of time after such agreement, without questioning the Union's lack of a majority. The settlement agreement was signed December 27, 1949. Poole's refusal to bargain was in early April, 1950, less than four months after the settlement agreement. The Board has found that this was not a reasonable period. We feel bound by this determination since we cannot say it was arbitrary. It follows that we must deny Poole's petition to set aside the Board's order, and we must accede to the Board's request for an enforcement of its order. See, Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 705–706, 64 S.Ct. 817, 88 L.Ed. 1020; Great Southern Trucking Co v. N. L. R. B., 4 Cir., 139 F.2d 984, 986–987, certiorari denied 322 U.S. 729, 64 S.Ct. 944, 88 L.Ed. 1564.

We are not unmindful of Poole's contention that the Board's order denies to the employees the right to choose freely their representative in collective bargaining—a right expressly guaranteed by Sections 7, 8(a) (5), 9(a) and 9(c) (1) and (3) of the Act as amended, 29 U.S.C.A. §§ 157, 158(a) (5) and 159 (c) (1) and (3). These employees are free to file a decertification petition after the settlement agreement has been in effect a reasonable length of time.

While not an admission of past liability, a settlement agreement does constitute a basis for future liability and the parties recognize a status thereby fixed. Thus, for example, a settlement agreement providing for reinstatement of employees fixes their eligibility to vote in a Board election, and a settlement providing for the disestablishment of a dominated union necessarily affects its right to appear on a ballot. An entire structure or course of future labor relationships may well be bottomed upon the binding effect of a status fixed by the terms of a settlement agreement. If a settlement agreement is to have real force, it would seem that a reasonable time must be afforded in which a status fixed by the agreement is to operate. Otherwise, settlement agreements might indeed have little practical effect as an amicable and judicious means to expeditious disposal or disputes arising under the terms of the Act. Thus, it follows that Poole, after having solemnly agreed to bargain with the Union, should not be permitted, within three and one-half months after the agreement, to refuse so to bargain, even if, as here, the Union clearly

did not represent a majority of the employees.

The petition of Poole praying that we set aside the order of the Board is denied. The petition of the Board for the enforcement of its order is granted.

Order enforced.

WYCHE, District Judge (dissenting).

The outstanding fact in this case, which is difficult to explain on any reasonable basis, is that an employer of labor, innocent of any wrongdoing, is being compelled to bargain with the union which has been formally repudiated by ninety-seven per cent. of the employees. The difficulty is heightened by the lack of any statute, administrative regulation or precedent to justify the Board's action.

The union's loss of the support of the workers is not disputed. It was chosen to represent them at an election which was held five years ago on November 27, 1946. From that day until April 10, 1950, it was continuously recognized by the company as the bargaining representative of the men and two one-year contracts were executed which spanned the period ending May 2, 1949, and thereafter the company continued to negotiate with the union whenever requested to do so. There is no evidence whatsoever in the record that the company failed to bargain with the union at any time prior to April 10, 1950.

The refusal to bargain which then occurred was due entirely to the repudiation of the union by the men which is established by undisputed evidence in two respects. On March 9, 1950, sixty-four out of sixty-six employees petitioned the Regional Director and the Labor Board to decertify the union; and on March 15, 1950, the Regional Director notified the company that the petition had been filed. This situation prevailed on April 10, 1950; and any doubt which the company might have entertained in respect to the matter was removed by the admission of the business representative of the union on April 10, 1950, that it no longer represented the men, coupled, nevertheless, with the demand that the company continue to recognize it.

The company's innocence of any wrongdoing is equally well established by undisputed evidence. There is affirmative proof of continuous negotiation with the union whenever it was requested to do so, and there is no evidence whatsoever that the company was at any time guilty of unfair labor practice or was subjected to a disciplinary order of the Board. Similarly the record contains no suggestion that the union's loss of the confidence of the men was caused by any improper conduct or interference on the part of the company or that the decertification petition of the men was suggested or stimulated in any way by company action.

Thus there is no actual basis for the argument that if the company's contention in this case is sound it would "permit an employer to commit an unfair labor practice by refusing to bargain collectively with the union, sign a settlement agreement undertaking to bargain with the union, then attempt to have a new union certified when dissatisfaction with the old union arose among the employees because of the unfair labor practice." However reprehensible such conduct may be, it has nothing to do with the case at bar. The company did not commit any unfair labor practice which led to the agreement of settlement and the dissatisfaction of the men with the union did not spring from improper conduct on the part of their employer. No adjudication to this effect has been made by the Board.

The agreement of settlement came about as the result of a complaint made by the union on May 9, 1949, that on April 25, 1949, the company refused to bargain with the union and on May 4, 1949, discharged nineteen men because of their membership in, and activity on behalf of, the union. These charges were vigorously denied and there is no evidence in the record to support either of them. Although the complaint was in the hands of the Regional Director from May to December, 1949, and an investigation was made by his field examiner, no formal charges against the company were filed. It goes without saying that if any evidence of discrimination existed, the Board would have caused formal charges to

be filed against the company and would have compelled it to reinstate the discharged men with back pay. Under the circumstances the agreement of settlement constituted no admission of guilt on the part of the company but merely evidenced the consent of the company to assume an obligation to do that which it had always done, namely, to abstain from interference with the freedom of the men and to bargain with the union as their representative. The refusal of the Board to distinguish between the facts in this case and those where a company at fault has entered into an agreement of settlement amounts to an abuse of discretion reviewable by the courts. See Pittsburgh Plate Glass Co. v. N. L. R. B., 8 Cir., 113 F.2d 698, 701, affirmed 313 U.S. 146, 152, 61 S.Ct. 908, 85 L.Ed. 1251; N. L. R. B. v. Botany Worsted Mills, 3 Cir., 133 F.2d 876; N. L. R. B. v. Delaware-New Jersey Ferry Co., 3 Cir., 128 F.2d 130; American Federation of Labor v. N. L. R. B., 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347; N. L. R. B. v. Fansteel Corp., 306 U.S. 240, 59 S. Ct. 490, 83 L.Ed. 627. The obligation to do justice in the individual case is not minimized by the volume of business which the Board is obliged to handle.

The Court of Appeals of the Sixth Circuit in N. L. R. B. v. Vulcan Forging Co., 188 F.2d 927, struck down an order of the Board which directed an employer to bargain with a union certified by the Board as the result of an election on March 13, 1947, at which the employees voted twelve to ten for the union. The Board's order was reversed because shortly after the election the employees drew up a statement dated March 21, 1947, and signed by nineteen of the twenty employees in which they severed their relations with the union.

The basic argument of the Board in support of its order is that the settlement agreement represents a determination of guilt on the part of the employer and that because of such finding of guilt remedial action is required. This argument reads into a settlement agreement concepts at variance with the customary understanding of settlement agreements. From time immemorial it has been the policy of the courts to favor settlements and consonant with this judicial policy it has been established that no admissions of guilt are to be imputed on account of a settlement. This is the customary and established understanding of settlements. Even offers of compromise are not admissible in evidence. The argument of the Board would reverse completely this established understanding of the effect of settlements. Such settled construction should not be lightly overturned. Without a clear expression from Congress that settlement agreements made under the National Labor Relations Act are to carry with them an admission of guilt, I am unwilling to read into settlements made under the National Labor Relations Act an admission of guilt contrary to the established and customary understanding. I do not believe that settlement agreements should be given such a radically different interpretation as to create a snare for employers in proceedings before administrative agencies.

I am convinced that any rule which would read into settlement agreements imputed admissions of guilt by one party to the settlement, if applied to settlements effected in connection with administrative agencies, would add tremendously to the work-load of the administrative agencies, would reduce markedly all settlements made in connection with proceedings before the agencies and would interfere with the orderly adjustment without hearing of numerous administrative disputes. If the settlements of a disputed or doubtful complaint under the National Labor Relations Act is to amount to an unqualified admission of guilt on the part of an employer, such employer could never safely settle any doubtful complaint, and, in order to protect himself, will be forced generally to litigate the complaint; the employer will prefer to have the merit of the charges decided in a hearing where he may cross-examine the union's witnesses and make his normal defenses thereto. The rule urged by the Board would thus add to the burdens of administrative agencies. Due regard for the administrative processes argue persuasively against this contention of the Board.

Actually, the theory of the Board's contention that an imputation of guilt is to be conclusively drawn from the settlement

agreement lies in its contention that, since the Board will only approve a settlement agreement after it has determined that the complaint filed has merit, accordingly the courts must conclude that the settlement agreement arising out of such dispute carries a final determination that there was guilt. The difficulty with this argument, as applied to the facts of the specific case, is that the Board had this particular complaint before it for a long period of time; that it had made an extensive investigation thereof and that it had failed to issue a complaint. If such investigation had established that there was merit in the complaint it would seem that the Board should have issued a complaint before the settlement agreement was negotiated.

The Board's whole case in this proceeding rests upon an attempt to give to a settlement agreement a construction at variance with established procedure and to give it the finality of a judgment made after hearing and evidence, and since there is nothing in the statute, nothing in the Board's Rules and Regulations, or in the Board's Statements of Procedure, or in any principle of law that I can find, to give the settlement agreement such construction, I cannot concur in the majority opinion.

It is, therefore, my opinion that the order of the National Labor Relations Board should be set aside, and the Board's request for enforcement of said order denied.