**PRIDE REFINING, INC., Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

**No. 76-2930.**

United States Court of Appeals, Fifth Circuit.

July 5, 1977.

George C. Dunlap, E. Lee Haag, III, Bowen L. Florsheim, Dallas, Tex., for petitioner-cross respondent.

Elliott Moore, Deputy Associate Gen. Counsel, John S. Irving Jr., Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Aileen A. Armstrong, Atty., David F. Zorensky, N.L.R.B., Washington, D. C., for respondent-cross petitioner.

W. Edwin Youngblood, Regional Director, 16th Region, N.L.R.B., Fort Worth, Tex., for other interested parties.

Before COLEMAN, Circuit Judge, KUNZIG, Associate Judge,[*] and GEE, Circuit Judge.

COLEMAN, Circuit Judge.

This case is before us upon the petition of Pride Refining, Inc. for review of, and a cross-application for enforcement of, an order of the National Labor Relations Board. The issue is whether the Board properly found that petitioner had violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a)(1) and (5), by withdrawing recognition from the Union and thereafter making unilateral changes in wages, hours, and working conditions of its employees without bargaining with the Union. For the reasons hereinafter stated we deny enforcement.

## I. FACTS

Pride Refining, Inc., operates an oil refinery in Abilene, Texas. On April 13, 1973, a majority of the operating and maintenance employees at petitioner's refinery selected the International Union of Operating Engineers, Local 826, AFL–CIO, as their collective bargaining representative. On April 23 the NLRB certified the Union as the exclusive bargaining representative of the employees of the unit, and on or about June 6, 1973, the Union requested the Company to bargain. Negotiations began and several meetings followed but no agreement was reached on the terms of a contract.

The Union then charged the Company with a refusal to bargain in good faith in violation of § 8(a)(5) of the Act. The Regional Director issued a complaint on December 28, 1973. The Company filed its answer specifically denying the charges. On January 9, 1974, the Union filed a second charge against the Company alleging further violations of § 8(a)(5). On January 24, 1974, the Regional Director issued an amended consolidated complaint.

On February 5, 1974, a hearing was begun on these matters before an Administrative Law Judge. On the third day of the hearing, prior to the closing of the General Counsel's case-in-chief, the parties executed a document which Pride says is a contract and which the Board (one member dissenting) insists is a settlement agreement, there being, of course, different consequences flowing from either. The document reads:

CONTRACT AND AGREEMENT

This contract and agreement entered into this 7th day of February 1974 by and between International Union of Operating Engineers AFL/CIO Local 826 hereinafter called the "Union" and Pride Refining, Inc., of Abilene, Texas, hereinafter called the "Company".

1. The Company hereby recognizes the Union as the exclusive bargaining representative of its employees employed at its Anson Road Refinery in Abilene, Texas, as defined and set out in that certain Certification issued by the National Labor Relations Board in Case No. 16–RC–6238.

It is expressly understood and agreed to by the parties hereto that this contract does not cover nor include the classification of billing clerk at the Anson Road Refinery. However, it is further understood and agreed that nothing contained herein will prejudice the Union's right to file an appropriate petition with the National Labor Relations Board seeking the inclusion of said billing clerk classification within the terms of the Certification mentioned above.

2. The Company agrees that it will maintain in effect for a period of six (6) months from the execution date hereof the following benefits which are now enjoyed by the covered employees:

a. The wages that are being paid as of the date of this agreement

b. Seven (7) paid holidays—New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day

c. Holiday pay—regularly scheduled hours at regular rate

* Associate Judge of the United States Court of Claims, sitting by designation.

d. Holiday worked—double time

e. Overtime pay—time and one-half for all over eight hours per day or forty hours per week

f. Temporary reclassification—employees shall receive rate of pay for higher classification for time worked in that classification

g. Call in or call back pay—a guaranteed four (4) full hours' work or pay in lieu thereof if an employee reports to work, is called in, or called back

h. Two (2) weeks paid vacation after one (1) year's employment and accrual of vacation benefits after one (1) year at the rate of one (1) week for each six (6) months employed with no more than a total of two weeks to be accrued at any given time

i. Sick pay for twenty-one (21) days at full pay at the regular rate of pay after a seven (7) day waiting period

j. The Company pays full employee cost of hospitalization insurance, $5,000 life insurance, double indemnity policy, $50,000 accidental death policy, and long-term disability policy. Disability coverage starts immediately following the twenty-one (21) days sick pay.

k. Uniforms—Pride will pay one-half (½) of uniform costs for five (5) sets initially and one-half (½) of one (1) set each quarter thereafter.

l. Any other existing economic benefits.

3. The Company agrees that it will not make any unilateral changes in the present working conditions, job duties, or hours of the employees covered in this contract without prior notice to the Union and opportunity to meet and bargain concerning any proposed change or changes. The Union agrees that upon receipt of such notice it will meet with the Company within a reasonable time in order to bargain about the said proposed changes.

4. The Union hereby promises and agrees that it will, immediately, after the execution of this contract, withdraw with prejudice to the refiling of the same, all unfair labor practice charges it is now asserting against the Company in Cases Nos. 16–CA–5328 and 16–CA–5413 entitled Pride Refining, Inc., and Local 826, International Union of Operating Engineers, AFL/CIO, now pending before an Administrative Law Judge of the National Labor Relations Board.

5. After the expiration of four (4) months from the execution hereof, either party hereto may terminate this contract upon giving the other party sixty (60) days written notice of the desire to terminate. If after the expiration of the said sixty-day period from the date the notice is given no agreement has been reached on a new contract, this contract will automatically expire and terminate as to all terms and provisions hereof.

Signed and executed by the parties hereto this 7th day of February 1974.

[Signatures]

After the execution of the document the Union requested leave to withdraw its charges and dismiss the complaint, to which counsel for the General Counsel had no objection. The complaint was accordingly dismissed, with prejudice. It is to be noted that this was not a settlement agreement entered into pursuant to § 101.9 of the Board's Statements of Procedure, which would have required participation of the Regional Director or the Board. The Administrative Law Judge found that "*In fact* (emphasis added), the Company entered into a contract with the Union, the culmination of the bargaining process, rather than into a 'settlement' in which it [the Company] would have agreed to desist from its allegedly unlawful conduct and to continue bargaining 'in good faith'."

During the first weeks following the agreement, the parties communicated by telephone as to bargaining matters. By

letter, on February 22, the Company proposed some changes in benefits and working conditions, which the Union agreed to immediately. On March 5, there was a meeting at the plant to discuss the promulgation of work and safety rules, and a higher rate of pay for one employee. On April 23, 1974, the Company forwarded a set of proposed work rules to the Union and answered some of the Union's pending requests and inquiries. The Union responded by renewing its request for an adjustment in pay for employee Perales and by requesting several changes in the proposed work rules. On June 4, the Company advised the Union that it had expanded Perales' duties to include cleaning without first discussing it with the Union because its maintenance contract had been cancelled. The Company offered at that time to discuss this matter with the Union if it so desired. By letter dated June 10, the Union indicated it would contact the Company soon about Perales and the proposed work rules. At no time during this period had the Union requested any bargaining as to wages, hours, and working conditions generally.

In the meantime, on May 23, 1974, the fat fell into the fire. The Company was presented with a two page petition signed by a number of plant employees containing the following words:

> We, the undersigned employees of Pride Refining, Inc., no longer wish to be represented by the Union of Operating Engineers Local 826 of the AFL–CIO. (GCX 27).

It was determined that the statement did not contain the signatures of a majority of the unit employees and the employees were so informed. On June 4, the Company was served with a supplementary petition which, together with the earlier one, contained the signatures of 23 of the 39 employees then in the unit. The four months primary term of the February 7 agreement had expired on June 7. The Company informed the Union in writing on June 10 that it had received a petition indicating that a majority of the unit employees no longer wished to be represented by the Union; that in view of its doubt that the Union now represented a majority of its employees, it was withdrawing recognition of the Union; and gave notice that it was exercising its right under the agreement to terminate in sixty days.

The Union responded on July 1 by letter informing the Company that since the current agreement was still in effect, it was requesting a meeting to discuss proposals relating to a retroactive wage increase, a shift differential, and a pension plan. It made no response to the Company withdrawal of recognition. The Company did not respond to the Union's request for bargaining.

On June 24, the Company announced an immediate pay raise for employees who were not members of the bargaining unit theretofore represented by the Union and plans for a pension plan to be established by October 1, 1974. On July 31, the Company announced a wage increase for all employees formerly under a union contract, effective August 11 (the date the contract would terminate in accordance with the 60 days notice), and a pension plan for the same employees by October 1, 1974. The Company did not, at any time before the expiration of the February 7 agreement, effectuate any of these announced changes in favor of the formerly represented employees.

On July 29, the Union filed a petition for an election within the same unit for which it had been certified on April 23 of the previous year. The Company was not notified of this petition until after its July 31st announcements had been posted. The Company and the Union agreed to a Stipulation for Certification Upon Consent Election, and an election was scheduled for August 30, 1974. The election was frustrated, however, because the Union filed a refusal-to-bargain charge on August 27 with respect to events subsequent to June 10. On September 24, the Union requested withdrawal of the representation petition based on the Regional Director's determination that the Union's refusal-to-bargain charge against the Company had merit.

A complaint was duly filed by the General Counsel in which it was alleged that, on and after June 10, 1974, the Company refused to bargain with the Union as exclusive bargaining agent of the employees in the unit by withdrawing recognition from the Union during the term of a collective bargaining agreement and by taking certain unilateral actions from June 24, 1974, to April 28, 1975.[1] After several amendments, this complaint was heard before an Administrative Law Judge on August 19, 1975. The Administrative Law Judge found that the February 7 agreement between the parties was a collective bargaining contract; that at the time of the Company's withdrawal of recognition, the certification year had ended and the Company had a good faith belief in the Union's loss of majority; and that the Company had properly withdrawn recognition and was not required to bargain further with the Union after June 10, 1974.[2]

The Board took a different view of the matter. A majority of the Board, Member Walther dissenting, concluded that the agreement operated as a settlement of unfair labor practice charges and consequently, due to the effects of the certification dated April 23, 1974, the Company was not entitled to withdraw recognition from the Union when it did.

## II. THE BOARD'S CONCLUSIONS

The theory of the Board is that on February 7 the parties entered into a settlement agreement and that under the holding in *Poole Foundry & Machine Co. v. NLRB,* 4 Cir. 1951, 192 F.2d 740, *cert. den.* 342 U.S. 954, 72 S.Ct. 626, 96 L.Ed. 709, the Company violated § 8(a)(5) of the Act by withdraw-

ing recognition from the Union before a reasonable time had lapsed. In *Poole* the Board held that the parties must bargain for a "reasonable time" after entering a Board-approved unfair labor practice settlement agreement containing a bargaining provision. This is to allow the bargaining relationship a period within which to function without questioning the Union's majority status. The policy has been extended to include out-of-Board settlements by Ted Mansour's Market, 199 NLRB 218 (1972).

To provide this "reasonable time" a majority of the Board would extend the certification year from February 7 to include that period during which the bargaining relationship was suspended by litigation of the Company's unfair labor practices. *See,* Haymarket Bookbinders Inc., 183 NLRB 121 (1970). This would prohibit the Company from questioning the Union's majority status for virtually a year from February 7, 1974.

The Board applies this remedy *sua sponte,* without it being presented by the General Counsel or another party, or noticed to the petitioner, or considered by the Administrative Law Judge.

The Board relies on the theory that the February 7 agreement was a settlement agreement and the Union was entitled to a *reasonable time* in which its majority status was not to be questioned. The difficulty with this position is that the parties themselves had voluntarily agreed that a reasonable period would be six months. The Board therefore held, in the alternative, that a failure to continue to recognize and

1. In addition to the actions set out above, the Company was also alleged to have violated § 8(a)(5) by unilaterally promulgating 29 work rules on December 11, 1974, without consulting the Union; by unilaterally announcing on February 4, 1975, without consulting the Union, that it had given its employees a wage increase on January 26, 1975, and that an employee pension plan had been in effect since October 1, 1974; by unilaterally discontinuing, on February 24, 1975, its practice of providing its employees free soft drinks without consulting the Union; and, on April 28, 1975, by unilater-

ally reducing its maintenance employees' regular working hours without consulting the Union.

2. The Administrative Law Judge also found the Company had committed a number of unfair labor practices in violation of §§ 8(a)(1) and 8(a)(3) of the Act. The Board adopted these findings and conclusions. These violations are not challenged by the Company and are not before this Court.

bargain with the Union for the full six months was a violation of § 8(a)(5).[3]

Since, as the Board sees it, a withdrawal of recognition would have been illegal under either the reasonable time test or the specified six months period, then any unilateral action taken by the Company after June 10, 1974, was also illegal.

### III. IS THIS A SETTLEMENT AGREEMENT?

Before the Board can get over the hill on either of these approaches it must have correctly held that the February 7 agreement is a *settlement* agreement. In characterizing that agreement as a settlement agreement, the Board takes the position that it is impossible to separate the Company's concessions from the Union's withdrawal of its charges, i. e., the Company induced the Union to withdraw the § 8(a)(5) charges by promising to bargain in good faith. Viewing the agreement as a product of negotiations to settle unfair labor practice charges, the Board considers it to be a substitute for a bargaining order. Therefore, the Board reasons, the agreement was essentially an out-of-Board settlement to which *Poole, supra*, and *Mansour, supra*, are applicable.

The key question is, therefore, whether the February 7 agreement is a collective bargaining contract or a settlement agreement amounting to a substitute for a bargaining order. It is not open to question that ordinarily in an 8(a)(5) settlement agreement the employer acknowledges the majority status of the Union and agrees to bargain collectively for a reasonable time. A contract, on the other hand, fixes conditions of employment.

The present agreement does include one indicia of a settlement agreement in that the Company continued its acknowledgement of the Union. The agreement does not, however, obligate the Company to bar-

gain in good faith for a new collective bargaining contract. The Company obligated itself to bargain *only* when it desired to make changes in the agreed-upon working conditions.

Instead, this agreement contains specific provision as to wages, hours, and working conditions for a specified time. Although it is true the agreed-upon conditions merely continue the *status quo*, "neither the Board nor this Court sits to, directly or indirectly, compel concessions or otherwise sit in judgment on the substantive terms of bargaining agreements or to step into the negotiations and seek to impose its own views of a desirable settlement". *M. R. & R. Trucking Co. v. NLRB*, 5 Cir. 1970, 434 F.2d 689, 695.

In addition, the parties agreed to a definite date and procedure for termination and also as to the effect of no new contract being reached after a termination notice. The words of Paragraph 5 provide only for the possibility of a new contract being negotiated following a termination notice. It does not establish a right to have bargaining take place.

The history of the parties themselves demonstrates that they considered this agreement to be the collective bargaining contract. At no time between February 7 and June 10 did either party indicate a desire to negotiate as to general wages, hours, or working conditions. In approving the Union's withdrawal of charges following these negotiations, the Administrative Law Judge noted that "the parties have advised me that [the Company and the Union] have reached a settlement of all the issues in dispute between themselves and that the Company and Union have entered into a *collective bargaining agreement*" (emphasis added). Also, in testimony before the Administrative Law Judge in the instant case the Union negotiator characterized the agreement as a contract.

---

**3.** The Board reasoned that under the second theory the Company would still have been in violation of the Statute for *all* of the unilateral actions after June 10 since withdrawal of recognition within the six month period was an unfair labor practice which would have precluded the Company from having a good faith doubt of the Union's majority status. *See*, e. g., Guerdon Industries, Inc., 218 NLRB 658 (1975).

The Board, in oral argument, asserts that the agreement can be a settlement agreement as well as a contract. It uses the rationale that the Company's concessions (i. e. the agreed-upon conditions of employment) were the *quid pro quo* for the Union's withdrawal of right to bargain charges. The inescapable fact is, however, that the Union agreed to dismiss the charges and the Administrative Law Judge accepted the dismissal because the parties *had already done that which a bargaining order would have required them to do*, i. e. they had bargained and, indeed, they had entered into a contract.

Since the February 7 agreement was, as it shows on its face, a collective bargaining contract and not a settlement agreement, we need not consider whether the certification year might properly be extended to require additional time for bargaining.

## IV. WITHDRAWAL OF RECOGNITION

We turn to the question whether the Company properly withdrew recognition from the Union on June 10. There are certain situations under which an employer may lawfully withdraw recognition and thereafter make unilateral changes, such as after lapse of the certification year if there are reasonable grounds to believe the certified union has lost majority support. McCulloch Corp., 132 NLRB 201 (1961). In order to permit collective bargaining to function, the Board has adopted a rule, now incorporated in the statute at § 8(b)(7)(A), that in the absence of unusual circumstances, a certified union's majority status must be honored for one year. *Brooks v. NLRB*, 348 U.S. 96, 104, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

After the expiration of the certification year, the presumption of the union's majority status continues but is normally rebuttable by a showing that the employer has a serious doubts that the union continues to hold a majority. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 597 n. 11, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *NLRB v. International Furniture Co.*, 5 Cir. 1954, 212 F.2d 431. This doubt must be in good faith and rest upon a reasonable basis. *NLRB v. Gulfmont Hotel Co.*, 5 Cir. 1966, 362 F.2d 588, 589.

Once a company has a reasonably based good faith doubt of the union's majority status, it may justifiably refuse to bargain with the union. *Brooks v. NLRB, supra; NLRB v. Little Rock Downtowner, Inc.*, 8 Cir. 1969, 414 F.2d 1084, 1091; *Deblin Mfg. Corp.*, 208 NLRB 392 (1974). This is true even when there is a binding collective bargaining contract in existence. *See, NLRB v. Gulfmont Hotel Co., supra.*

Here the Company sought to avoid its bargaining responsibility by interjecting a good faith doubt of the Union's majority status based on the May 23 and June 4 petitions presented to it by its employees. There has been no dispute in this case as to the genuineness of the petitions or to the Company's objectively based good faith. The Administrative Law Judge specifically found that the Company "had a reasonably based doubt of the Union's continued majority status". The Board does not speak to the issue.

During the last sixty days of the contract term, the Company did not disavow the contract or implement any unilateral changes in it. It did not refuse to administer the contract, nor did it refuse to permit the Union to carry out its function as bargaining agent. What the Company refused to do was to *bargain with the Union for a new contract*. As we understand the law, the Company was not obligated to do so.

Since the Company did not violate § 8(a)(5) of the Act by its withdrawal of recognition from the Union, it follows that the Company's unilateral actions taken after June 10, 1974, also do not violate the statute.

ENFORCEMENT DENIED.