965 F.2d 141
 140 L.R.R.M. (BNA) 2509, 122 Lab.Cas. P 10,260
 RANDALL DIVISION OF TEXTRON, INCORPORATED, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America, UAW,
Intervening Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America, UAW,
Intervening Petitioner,
v.
RANDALL DIVISION OF TEXTRON, INCORPORATED, Respondent.
 Nos. 91-1264, 91-1450.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 9, 1992.
Decided May 18, 1992.
 
 Hudnall A. Pfeiffer (argued), Todd M. Nierman, Baker & Daniels, Indianapolis, Ind., for Randall Div. of Textron, Inc.
 Margaret G. Bezou (argued), N.L.R.B., Contempt Litigation Branch, Aileen A. Armstrong, Howard E. Perlstein, Scott MacDonald, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., William T. Little, Rik Lineback, N.L.R.B., Region 25, Indianapolis, Ind., for N.L.R.B.
 Barry A. Macey, Nora L. Macey, Janice Kreuscher (argued), Segal & Macey, Indianapolis, Ind., for International Union of United Auto., Aerospace and Agr. Implement Workers of America, UAW.
 Before FLAUM, EASTERBROOK, and MANION, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 The National Labor Relations Board found that the Randall Division of Textron, Inc. violated §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), by refusing to bargain with the United Auto Workers at Randall's Morristown, Indiana plant. The Board ordered Randall to bargain with the UAW. Randall has petitioned for review of the Board's order, and the Board has cross-petitioned for enforcement. Because we agree with the Board that Randall's previous settlement with the UAW of a refusal to bargain charge obligated Randall to bargain with the UAW for a reasonable time, we deny Randall's petition for review and order enforcement of the Board's order.
 
 I.
 
 2
 In December 1986, American Carco of Indiana, Inc. was forced into bankruptcy. Randall, which had bought parts from American, negotiated a lease-purchase agreement with the bankruptcy court for American's factory in Morristown. Randall began operations in the plant in January 1987.
 
 
 3
 The UAW had represented American's production, laboratory, and maintenance employees at Morristown since 1978. After Randall took over the Morristown plant, the UAW, insisting that Randall was a successor employer, demanded recognition and bargaining. When Randall refused, the UAW filed an unfair labor practice charge. The NLRB's Regional Director issued a complaint alleging that Randall was a successor to American and that Randall had violated §§ 8(a)(1) and (5) of the Act by refusing to bargain with the UAW. The Regional Director also filed suit in district court for an injunction pursuant to § 10(j) of the Act, 29 U.S.C. § 160(j).
 
 
 4
 Shortly before the scheduled hearing on the charge, the Administrative Law Judge suggested that Randall and the UAW settle their differences. Representatives of Randall and the UAW agreed with the ALJ's advice and retired to a separate room to negotiate. The UAW wanted immediate recognition and bargaining. While Randall was not averse to recognizing the UAW (all of Randall's other seven plants were organized, two by the UAW), Randall did not want to bargain immediately because it wanted time to expand the Morristown factory facilities and work force free from the pressures of having to negotiate or respond to grievances.
 
 
 5
 Randall and the UAW eventually struck a written agreement that accommodated each other's concerns. The UAW agreed that all pending charges would be withdrawn and that the district court suit would be dismissed. Randall agreed to recognize the UAW immediately. But immediate recognition did not mean immediate bargaining; instead, Randall and the UAW agreed to place a "total moratorium on any obligation by Randall to bargain over wages, hours, and other terms and conditions of employment for a period of eighteen (18) months from the date Randall receives clear title to the Morristown plant...." The agreement also set out a limited grievance and arbitration procedure for discharged non-probationary employees and a provision barring strikes over discharges.
 
 
 6
 In August 1987, Randall received clear title to the Morristown plant. Eighteen months came and went, and the UAW asked Randall to bargain. But despite the settlement agreement, Randall withdrew recognition from the UAW and refused to bargain, claiming that it had a good faith doubt about whether the UAW represented a majority of the plant's employees. The UAW filed another unfair labor practice charge against Randall, and the Regional Director filed another complaint alleging that Randall violated §§ 8(a)(1) and (5) of the Act by refusing to bargain. This charge proceeded to a hearing, after which the ALJ decided that Randall had violated §§ 8(a)(1) and (5). The ALJ found that the settlement agreement required Randall to bargain upon request after 18 months from the date Randall received clear title to the plant. Randall could not avoid this bargaining obligation by asserting a good faith doubt about the UAW's majority status because the agreement gave the UAW an "irrebuttable presumption" of majority status for a reasonable time beginning at the end of the 18-month bargaining moratorium. The ALJ also found that, in any event, Randall had not shown it had an objectively based good faith doubt about whether a majority of the Morristown employees supported the UAW.
 
 
 7
 The Board affirmed the ALJ's decision on two bases. First, although the Board found it unnecessary to pass on the ALJ's use of the term "irrebuttable presumption," it nevertheless found that Randall's settlement of the earlier refusal to bargain charge imposed a duty on Randall to bargain for a reasonable period of time during which Randall could not question the UAW's majority status. Second, the Board found that Randall failed to establish it had a good faith doubt about the UAW's majority status. The Board ordered Randall to bargain with the UAW at the UAW's request. Randall asks us to review this order; the Board asks us to enforce it.
 
 II.
 A.
 
 8
 Congress has delegated to the National Labor Relations Board the principal responsibility for deciding labor disputes. See NLRB v. Curtin Matheson Scientific, 494 U.S. 775, 786, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990). Consequently, our review of Board decisions in unfair labor practice cases is deferential. The Board's factual findings are conclusive if supported by substantial evidence in the record as a whole. 29 U.S.C. § 160(e); David R. Webb Co., Inc. v. NLRB, 888 F.2d 501, 503 (7th Cir.1989); Operating Engineers v. NLRB, 755 F.2d 78, 81 (7th Cir.1985). Substantial evidence is evidence that " 'a reasonable mind might accept as adequate to support a conclusion.' " Operating Engineers, 755 F.2d at 81 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Similarly, we will uphold the Board's legal conclusions " 'unless they are irrational or inconsistent with the [Act].' " David R. Webb, 888 F.2d at 503 (quoting NLRB v. Parents and Friends of the Specialized Living Center, 879 F.2d 1442, 1448 (7th Cir.1989)); see also Operating Engineers, 755 F.2d at 81.
 
 
 9
 The Board held that Randall was obligated to bargain with the UAW for a reasonable time regardless of whether a majority of the Morristown employees supported the UAW. As Randall correctly points out, recognizing and bargaining with a minority union usually violates §§ 8(a)(1), (2), and (3) of the Act. See Garment Workers v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); Bellwood General Hospital v. NLRB, 627 F.2d 98, 102 (7th Cir.1980). Allowing employers to recognize and bargain with minority unions is thought to impair the employees' rights guaranteed by §§ 7 and 9(a) of the Act to freely choose their own bargaining representatives, or to choose not to be represented at all, through the exercise of majority rule. See Garment Workers, 366 U.S. at 737, 738-39, 81 S.Ct. at 1607-08; 29 U.S.C. §§ 157 (ensuring employees the right to bargain collectively through representatives of their own choice, or to refrain from collective bargaining) and 159(a) (providing that the collective bargaining representative chosen by a majority of employees in a unit shall be the employees' exclusive representative). Therefore, an employer may usually justify its refusal to bargain with an established union by showing the union no longer represents a majority of employees. Also, to ameliorate the dilemma that faces an employer that is not sure of the union's continued majority support (because bargaining will be an unfair labor practice if the union turns out not to represent a majority, and refusing to bargain will be an unfair labor practice if the union does represent a majority), the Board generally will allow an employer to justify a refusal to bargain with an established union by showing that at the time it refused to bargain it had a good faith doubt about whether the union represented a majority of employees. See Bellwood, 627 F.2d at 102. Where an employer demonstrates that it held a good faith doubt as to the union's majority status, the burden shifts to the Board to produce evidence that on the date the employer refused to bargain, the union did represent a majority of the employees. See Curtin Matheson, 494 U.S. at 804, 110 S.Ct. at 1558 (Scalia, J., dissenting); Orion Corp. v. NLRB, 515 F.2d 81, 85 (7th Cir.1975) (per curiam).
 
 
 10
 Despite the rule generally prohibiting bargaining with minority unions, the Board has decided, with court approval, that in some circumstances the interests of industrial peace and stability in bargaining relationships are better served by not allowing an employer to question a union's majority status for a reasonable time during which bargaining is to occur. Thus, an employer usually may not withdraw recognition from a union for one year after the Board has certified the union as the employees' bargaining representative despite questions about the union's majority status. Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); NLRB v. Jarm Enterprises, Inc., 785 F.2d 195, 205 (7th Cir.1986); see also Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 37-38, 107 S.Ct. 2225, 2232-33, 96 L.Ed.2d 22 (1987). Similarly, an employer that voluntarily recognizes a union must bargain with the union for a reasonable time without questioning the union's majority status. Royal Coach Lines, Inc. v. NLRB, 838 F.2d 47, 51-52 (2d Cir.1988); NLRB v. Cayuga Crushed Stone, 474 F.2d 1380, 1381-84 (2d Cir.1973). By requiring bargaining in these situations, the Board is attempting to promote stable bargaining relationships between employers and unions. Requiring the employer to bargain for a reasonable time removes the employer's incentive to try to evade bargaining by procrastinating in the hope that the union's majority will erode over time. Requiring the employer to bargain also gives the union sufficient time to carry out its bargaining mandate, free from the pressure to produce instant results and to prove its effectiveness to the employees. See Brooks, 348 U.S. at 99-100, 75 S.Ct. at 178-79.
 
 
 11
 In Poole Foundry and Machine Co., 95 NLRB 34 (1951), enforced, 192 F.2d 740 (4th Cir.1951), the Board applied similar reasoning to hold that an employer that agreed to bargain in exchange for a union's agreement to drop a refusal to bargain charge was obligated to bargain with the union for a reasonable time without questioning the union's majority status. The Board in Poole reasoned that if a settlement containing a bargaining provision is to have any force, the parties must have a reasonable time to actually bargain. 95 NLRB at 36. The reasonable time to bargain requirement removes the employer's incentive to rid itself of a refusal to bargain charge without actually having to bargain by the facile expedient of settling the charge and then asserting doubts about the union's majority to avoid bargaining. See Poole, 192 F.2d at 743. The bargaining requirement also promotes stability and industrial peace by giving the bargaining relationship a chance to succeed. See NLRB v. Key Motors Corp., 579 F.2d 1388, 1390-91 (7th Cir.1978); Straus Communications, Inc., 246 NLRB 846, 847 (1979).
 
 B.
 
 12
 The Board applied the rule adopted in Poole to this case. The Board held that Randall agreed to bargain in exchange for the UAW's agreement to drop its refusal to bargain charge. Therefore, Randall was obligated to bargain with the UAW for a reasonable time and Randall could not question the union's majority status during that time. Randall argues that Poole is distinguishable because in Poole, the Board formally approved the settlement, while in this case the settlement was more informal: the parties did not read the settlement into the record; the ALJ did not question the parties about the settlement's terms; the General Counsel's attorney, while stating that she "did not oppose the agreement," did not expressly say she approved it; and the General Counsel's attorney did not expressly approve (though she did not disapprove) the dismissal of the unfair labor practice complaint. Although Randall correctly notes a distinction between formal and informal settlements, the distinction makes no difference in this case.
 
 
 13
 In NLRB v. Vantran Electric Corp., 580 F.2d 921, 924-25 (7th Cir.1978), this circuit noted the distinction between formal and informal settlements. In Vantran we indicated that we would routinely enforce formal settlements requiring an employer to bargain in exchange for a union's agreement to dismiss a refusal to bargain charge. See id.; see also NLRB v. All Brand Printing Corp., 594 F.2d 926, 930 (2d Cir.1979). This is so for two reasons. The Board's involvement in the formal settlement process " 'clearly manifests an administrative determination by the Board that some remedial action is necessary to safeguard the public interests intended to be protected by the National Labor Relations Act.' " Id. at 924 (quoting Poole, 192 F.2d at 743). Formal Board involvement in a settlement requiring bargaining also makes it more likely that the parties "intended the scope of that bargaining duty to satisfy Board standards," which includes the requirement that bargaining continue for a reasonable time. Id.
 
 
 14
 Informal settlements are treated differently. An informal settlement may still impose a duty on an employer to bargain for a reasonable time without questioning the union's majority status. See, e.g., NLRB v. Accurate Web, Inc., 818 F.2d 273, 276 (2d Cir.1987); VIP Limousine, 276 NLRB 871 (1985). But in Vantran, we held that we must carefully analyze informal settlements to determine "the intended scope of the bargaining provision." Vantran, 580 F.2d at 924. An important consideration in this analysis is whether the employer's agreement to bargain was a quid pro quo for the union's agreement to drop its refusal to bargain charge. Id. If so, we may conclude that the agreement obligated the employer to bargain for a reasonable time without questioning the union's majority status. Id. at 924-25; accord Accurate Web, 818 F.2d at 276; VIP Limousine, 276 NLRB at 876. If not, then the Board must show by some other means that the parties intended the bargaining agreement to preclude challenges to the union's majority status. Vantran, 580 F.2d at 925.
 
 
 15
 Randall argues that it could refuse to bargain based on a reasonable doubt about the UAW's majority status because the settlement was not a formal settlement and does not expressly preclude challenges to the UAW's majority status. The Board found against Randall on both counts. Although we have some doubt about whether the settlement was surrounded by sufficient Board formalities to require bargaining automatically, cf. Accurate Web, 818 F.2d at 276, we do not have to decide that question because we conclude that substantial evidence supports the Board's finding that Randall's promise to bargain was the quid pro quo, or primary concession, for the UAW's promise to drop its refusal to bargain charge.
 
 
 16
 Randall argues that the settlement agreement did not insulate the UAW from challenges to its majority status because it did not expressly state that "Randall will bargain with the UAW regardless of the UAW's majority status." According to Randall, if the UAW wanted such a bargaining commitment, it could have insisted on clearer language in the bargaining agreement setting out that commitment. But the law does not require such an express statement, so long as Randall agreed to bargain and that agreement was the quid pro quo for the UAW's agreement to drop its refusal to bargain charge. Cf. Straus Communications, Inc., 246 NLRB 846, 847 (1979), enforced, 625 F.2d 458, 464 (2d Cir.1980). The Board found that the settlement agreement obligated Randall to bargain 18 months after it obtained clear title to the Morristown plant and that Randall's agreement to bargain was its primary concession for the UAW's agreement to drop its refusal to bargain charge. Substantial evidence supports these findings. The agreement explicitly alluded to a bargaining relationship, stating that Randall would "grant recognition to [the UAW] as the bargaining representative...." The agreement then imposed a "moratorium" on Randall's obligation to bargain. "Moratorium" connotes a delay in fulfilling an obligation and thus implies the obligation's eventual fulfillment. See The Random House College Dictionary 867 (defining "moratorium" as "a legal authorization to delay the performance of some legal obligation"); Black's Law Dictionary 910 (5th ed. 1979) (defining "moratorium" as "a period of ... delay; specifically, a period during which an obligor has a legal right to delay meeting an obligation"). If Randall and the UAW did not agree to bargain, the term "moratorium"--a term carefully chosen by the negotiators--would have no meaning in the agreement.
 
 
 17
 Moreover, the ALJ expressly found that Randall's representatives told the UAW that Randall would bargain after 18 months. Substantial evidence supports that finding. The UAW's witnesses testified that Randall's representatives made the bargaining commitment. They also testified that they would not have withdrawn the refusal to bargain charge absent recognition and a commitment to bargain. Randall's representatives testified that they never expressly promised to bargain, but the ALJ chose to credit the UAW's witnesses. The agreement's language, the UAW's insistence on recognition, and Randall's agreement to recognize the UAW support the ALJ's credibility determination. Recognition and bargaining generally go hand in hand; why else seek--or grant--recognition if not to bargain? The ALJ could reasonably infer from the union's emphasis on recognition and bargaining that Randall knew bargaining was the price it had to pay--that is, the quid pro quo--for an agreement by the UAW to drop its refusal to bargain charge.
 
 
 18
 So, the settlement agreement contained a promise by Randall to bargain as Randall's primary concession for the UAW's promise to drop its refusal to bargain charge, and such a promise generally obligates an employer to bargain for a reasonable time. However, Randall argues that it could still rely on its good faith doubt about the UAW's majority status to escape bargaining because the settlement agreement was not really a settlement agreement. Instead, says Randall, because the parties agreed to a limited grievance procedure and no-strike clause, the agreement was actually a collective bargaining agreement. Since there is no absolute duty to bargain, despite doubt about the union's majority status, at the termination of a collective bargaining agreement, Randall says it was not obligated to bargain with the UAW in the face of its doubt that the UAW represented a majority.
 
 
 19
 Randall relies on Pride Refining, Inc. v. NLRB, 555 F.2d 453 (5th Cir.1977). In Pride Refining, the Fifth Circuit refused to enforce an NLRB order directing an employer to bargain, despite the employer's doubt about the union's majority status, pursuant to an agreement settling a previous refusal to bargain charge by the union. The Fifth Circuit held that the agreement was a collective bargaining agreement rather than a settlement agreement. Id. at 458-59.
 
 
 20
 Randall's reliance on Pride Refining is misplaced. Pride Refining involved a detailed agreement between the employer and union that specifically addressed wages, holidays, sick days, overtime, vacation, and several other conditions of employment for a specified period. See id. at 454-55. Moreover, the record in Pride Refining demonstrated that the parties had entered into a collective bargaining agreement. The parties had begun negotiating for a collective bargaining agreement before the employer broke off talks, id. at 454; the bargaining that produced the agreement could be seen as a continuation of those negotiations. Thus, the parties told the ALJ that they had entered into a collective bargaining agreement. Id. at 458. Perhaps most important, while the agreement contained specific provisions regarding terms of employment, nothing in the agreement obligated the employer to bargain for a new agreement. Id. On these facts, the Fifth Circuit justifiably concluded that "the parties had already done that which a bargaining order would have required them to do, i.e., they had bargained and, indeed, they had entered into a contract." Id. at 459 (emphasis in original). That being the case, there was no interest to be served in ordering more bargaining.
 
 
 21
 The fact that the agreement between Randall and the UAW set out a limited grievance procedure and no-strike clause did not necessarily change the agreement from a settlement into the type of agreement that Pride Refining held did not create a duty to bargain. Pride Refining does not stand for the proposition that any settlement that mentions a term of employment is no longer a settlement agreement. Pride Refining involved an agreement that set out detailed terms of employment, that the parties characterized as a collective bargaining agreement, and that did not include any obligation to bargain further. The agreement between Randall and the UAW did not contain any detailed provisions concerning terms of employment, and there is no evidence that Randall and the UAW even bargained over those issues. Moreover, the agreement between Randall and the UAW specifically obligated Randall to bargain. The Board could reasonably conclude that unlike the parties in Pride Refining, Randall and the UAW did not do "that which a bargaining order would have required." Indeed, the whole point of the negotiations and agreement in this case was to avoid detailed bargaining until the future.
 
 
 22
 Randall's argument really boils down to a contention that its agreement to the limited grievance procedure, rather than its agreement to bargain, was the primary concession it made for the UAW's agreement to drop its refusal to bargain charge. The Board found otherwise. As we have already demonstrated, substantial evidence supports that finding.
 
 
 23
 Randall makes two other arguments. The first is based on the fact that the UAW's original refusal to bargain charge was based on the theory that Randall had a duty to bargain as a successor employer. Generally, a successor employer, like any other employer, may withdraw its recognition of a union at any time after one year from the union's original certification. Landmark Int'l Trucks, Inc. v. NLRB, 699 F.2d 815, 818-19 (6th Cir.1983); Harley-Davidson Trans. Co., 273 NLRB 1531 (1981). Randall argues that any bargaining duty it had was based on its status as a successor. Since a successor may withdraw recognition from and refuse to bargain with a union based on a good-faith doubt about the union's majority status, Randall says it should have been able to refuse to bargain with the UAW based on its good-faith doubt about the UAW's majority status.
 
 
 24
 The Board rejected a similar argument in Van Ben Industries, Inc., 285 NLRB 77, 78-79 (1987), holding that an alleged successor that agrees to bargain in exchange for a union's agreement to dismiss a failure to bargain charge must bargain for a reasonable time without questioning the union's majority status. Randall argues that Van Ben is distinguishable because the employer in Van Ben, unlike Randall, admitted it was a successor. Therefore, says Randall, this case should be controlled by Harley-Davidson, a case in which the employer acknowledged only that it "might be a successor." Van Ben, however, did not depend on this specious distinction. Instead, the important distinction between Van Ben and Harley-Davidson (and between Harley Davidson and this case) is that in Van Ben (as here) the employer agreed to bargain to settle the union's refusal to bargain charge. See 285 NLRB at 78. Neither Harley-Davidson nor Landmark involved settlements. The Board could reasonably decide in this case that a reasonable time to bargain free from challenges to the UAW's majority status was necessary to allow the bargaining agreement "to achieve its purpose"; that is, to produce actual bargaining toward an agreement. Id.
 
 
 25
 Randall finally argues that even if it was obligated to bargain for a reasonable time before it could question the UAW's majority status, a reasonable time had already passed in this case because the 18-month moratorium on bargaining should count as part of the reasonable time. According to Randall, the purpose of the reasonable time period is to allow the union to "demonstrate its effectiveness" with the employees, and 18 months was more than sufficient time for the UAW to do that, especially since the UAW had represented the Morristown employees for 10 years before Randall bought the plant.
 
 
 26
 The flaw in Randall's argument is that Randall's settlement with the UAW obligated it to bargain for a reasonable period of time so that the bargaining relationship could have a fair chance to succeed. See, e.g., Straus Communications, 246 NLRB at 846; Van Ben, 285 NLRB at 78. Whether a reasonable period has elapsed thus logically depends on whether Randall and the UAW had an adequate opportunity to bargain. Randall never did bargain with the UAW, so no reasonable time could have passed for bargaining to take place. Randall, having bargained for and received an agreement to delay bargaining for a significant period, cannot eat its cake and have it at the same time by using that period of delay to justify another refusal to bargain. Cf. All Brand, 594 F.2d at 931 (settlement that delayed bargaining for three years still obligated employer to bargain for a reasonable time).
 
 III.
 
 27
 Randall promised to bargain with the UAW. The law holds Randall to that promise. Almost five years have passed since Randall made its promise, and more than three years have passed since bargaining was supposed to begin. It is now time for Randall to live up to its promise. Therefore, we deny Randall's petition for review and grant the Board's petition to enforce its order.