NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ALL BRAND PRINTING CORPORATION, Respondent.

No. 585, Docket 78–4148.

United States Court of Appeals, Second Circuit.

Argued Feb. 28, 1979.

Decided March 21, 1979.

Allison W. Brown, Jr., Washington, D. C., Atty., N. L. R. B. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Lynne E. Deitch, Atty., N. L. R. B., Washington, D. C., of counsel), for petitioner.

Richard M. Naness, Hewlett, N. Y. (Lawrence I. Milman, Hewlett, N. Y., of counsel), for respondent.

Before FEINBERG, TIMBERS and MESKILL, Circuit Judges.

FEINBERG, Circuit Judge:

The National Labor Relations Board seeks enforcement of its order requiring All Brand Printing Corporation to bargain in good faith with the New York Printing Pressmen and Offset Workers Union, Local 51, International Printing Pressmen and Assistants Union of North America, AFL–CIO. The Board's petition raises the rarely litigated question of the effect of an employer's agreement to bargain, made as part of a settlement of an unfair labor practice proceeding. For reasons set forth below, we enforce the Board's order.

I

The background of the settlement agreement here involved is somewhat unusual. The Company was in Chapter XI bankruptcy proceedings from December 1971 to March 1975, during which time it operated as a debtor in possession. A little over a year before the bankruptcy proceedings began, the Union had been certified as the bargaining agent for the Company's skilled employees, after a Board-conducted election. The Union then attempted to negotiate with company officials several times during the months following and the Company continuously replied that it could not afford a union contract. In November 1971, the Union filed an unfair labor practice charge with the Board.[1] In December 1971, on the same day that the Company filed its Chapter XI petition, the Regional Director of the Board issued a complaint alleging that the Company had violated section 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq.

In the Chapter XI proceeding, the district judge issued the usual order restraining all persons from proceeding with any actions against the Company, and the Board and the Union were notified that the restraint applied to them. The Board then moved in the bankruptcy court for a modification of the restraining order, and the settlement now at issue was reached during a recess of the hearing on the motion. By its terms, the Company and the Union agreed that the Union would withdraw its unfair labor practice charge before the Board in return for the Company's promise that it would commence bargaining with the Union 60 days after an arrangement with the Company's creditors was confirmed by the bankruptcy court. Pursuant to the agreement, the Union's attorney appeared at the scheduled Board hearing on the complaint against the Company, and requested permission to withdraw the Union's charge. An attorney appeared for the General Counsel for the Board and stated that the General Counsel approved the withdrawal request and had no objection to dismissal of the complaint. The administrative law judge then approved the Union's request to withdraw its charge, and dismissed the complaint.

Three years later, in March 1975, the bankruptcy court confirmed an arrangement with the Company's creditors. Apparently, the Union was not informed of this event until almost four months later. After several delays, the parties finally held a bargaining session in October 1975. At this time, the Company appeared interested in the Union's proposals and promised to furnish the Union with information about the Company's employees, their wages and benefits. Less than a month later, the Company changed its position and informed the Union that it would not provide the promised information and that it would not negotiate further because it could not afford a contract. After the Company reiterated this position several times, the Union again filed charges with the Board.

The administrative law judge found, after a hearing, that the Company had violated the Act by refusing to bargain since September 4, 1975. The Board adopted the findings and conclusions of the administrative law judge, 236 NLRB No. 14 (1978), and ordered the Company to cease and desist its unfair labor practices, to bargain

---

1. The Union first filed an unfair labor practice charge in April 1971, but the Regional Director declined to issue a complaint.

with the Union and to furnish the Union with information relevant to the collective bargaining negotiations and contract proposals. This application to enforce the Board's order followed.

## II

The Company argues that it was not obliged to bargain with the Union because it had a good faith doubt as to the Union's majority status. The Board rejoins that the settlement agreement precludes the Company from challenging the Union's majority status until there has been a reasonable period of bargaining in accordance with the settlement agreement. The Company responds that obligations imposed by an "out-of-Board" settlement agreement cannot be the basis of a refusal to bargain charge.

We turn first to the question of the effect of the settlement agreement. The Board's own procedures contemplate various kinds of agreements settling unfair labor practice cases. A formal settlement is subject to approval of the Board in Washington, D.C. and "the Board may issue an order requiring the respondent to take action appropriate to the terms of the settlement"; ordinarily, such an agreement also contains "the respondent's consent to the Board's application for the entry" of an enforcement decree in "the appropriate circuit court of appeals." See NLRB Statements of Procedure, Series 8, 29 C.F.R. § 101.9(b)(1). Informal settlement agreements are not subject to Board approval and do not become the subject of a Board order, but they must be approved by a regional director and, in some instances, by an administrative law judge. See id. §§ 101.7, 101.9. A settlement prior to the issuance of a complaint must be informal. After a complaint is issued, the Board prefers a formal settlement, but the Regional Director has discretion to approve an informal settlement prior to commencement of the hearing. After the opening of the hearing, any settlement must be approved by the administrative law judge. The settlement at this stage can be either formal or informal. See id.

The law is clear that an employer must engage in one full year of good faith

bargaining with a union following its certification, regardless of any changes in the majority status of the union. See *Brooks v. NLRB,* 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). The purpose of this insulated period is to give collective bargaining time to produce results and to promote stability in industrial relations. If the employer refuses to bargain in good faith during the certification year, the Board has the power to extend or renew the certification year as a remedy for a section 8(a)(5) violation. See *Franks Bros. Co. v. NLRB,* 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); *Glomac Plastics, Inc. v. NLRB,* 592 F.2d 94 at 100–101 (2d Cir. 1979), and cases cited therein. The insulated period has also been applied to an employer's agreement to bargain with a union in settlement of a section 8(a)(5) charge. If the settlement agreement is valid, then the employer must bargain in compliance with it for a reasonable time without regard to whether the union continues to have the support of a majority of the employees. See *Poole Foundry & Machine Co. v. NLRB,* 192 F.2d 740 (4th Cir. 1951), *cert. denied,* 342 U.S. 954, 72 S.Ct. 626, 96 L.Ed. 709 (1952).

Turning then to the effect of the settlement agreement here, we have found very few reported decisions on the subject, other than *Poole Foundry, supra,* probably because the parties usually fulfill their obligations under such agreements. In *NLRB v. Vantran Electric Corp.,* 580 F.2d 921 (7th Cir. 1978), the Seventh Circuit discussed the differences between formal and informal settlements and held that the two types of agreement should be treated differently. The court stated:

> The critical issue which emerges in the present case is whether the agreement was a valid settlement agreement. Although we are willing to approve an extension of the Board's remedial powers to enforce bargaining provisions of totally private, out-of-Board settlement agreements, we perceive the need for some standards in this area. We distinguish between Board-approved and out-of-Board settlements because, . . . a Board-approved settlement "clearly manifests an administrative determination by

the Board that some remedial action is necessary to safeguard the public interests intended to be protected by the National Labor Relations Act." *Poole Foundry & Machinery Co. v. N.L.R.B.,* [192 F.2d] at 743. In out-of-Board settlements, on the other hand, the Board has had no opportunity to determine whether any remedial action is appropriate. It merely acquiesces in the request of the charging party to withdraw charges and may do so without knowledge of the settlement agreement or all pertinent background facts. Moreover, if the Board is involved in the settlement, which includes a bargaining provision in exchange for withdrawal of a § 8(a)(5) charge, the parties are more likely to have intended the scope of that bargaining duty to satisfy Board standards.

For these reasons, out-of-Board settlements should be carefully analyzed to determine the intended scope of the bargaining provision. An important factor in this analysis is whether the employer's agreement to bargain was a *quid pro quo* for the union's agreement to withdraw its § 8(a)(5) charge. If it was, the parties probably intended that the employer fulfill a bargaining obligation that it allegedly violated, which would, for example, justify bargaining for an extended certification year. If it was not, the intent of the parties would be less clear and the burden would be on the Board in seeking enforcement to show that the scope of the bargaining obligation was broader than the literal language of the provision indicated.

580 F.2d at 924–25. Thus, apparently the Seventh Circuit will routinely enforce formal settlements, in contrast to its treatment of informal settlements, which it characterizes, as does the Company here, as "out-of-Board" settlements. The latter should be "carefully analyzed" and enforced only when the agreement to bargain was given in consideration of the withdrawal of the refusal to bargain charge or the Board otherwise establishes that the parties intended the bargaining provision to preclude challenges to a union's majority status. Although the parties cite other cases to us,

they are not controlling. Thus, in *Pride Refining, Inc. v. NLRB,* 555 F.2d 453 (5th Cir. 1977), the Fifth Circuit refused to enforce a Board order requiring the employer to bargain in compliance with a settlement agreement, because the court viewed the document as a collective bargaining contract, rather than as a settlement agreement. And in *NLRB v. Key Motors Corp.,* 579 F.2d 1388 (7th Cir. 1978), decided the same day as *Vantran,* the same panel held that the Board exceeded its remedial power in requiring an employer to bargain on the basis of an agreement settling an unfair labor practice proceeding that did not involve a refusal to bargain charge. Since there had been no complaint of interruption of bargaining, the court found no justification for extending the bargaining period.

■■ We agree with the Seventh Circuit that the level of scrutiny applied to settlement agreements should vary inversely with the formality of the agreement and the degree of Board involvement in the settlement process. However, we conclude that the formalities and the extent of Board involvement here are sufficient to justify giving the settlement agreement binding effect. Although the settlement in this case was informal in the sense that it was not incorporated into a Board order issued in Washington, the settlement was nevertheless surrounded by formalities. It occurred at the opening of a hearing before an administrative law judge, who was informed of the terms of the settlement. The administrative law judge conducted an on the record inquiry into the propriety of the settlement before accepting it. In addition, the agreement was approved by a representative of the General Counsel for the Board, who in this capacity acted for the Regional Director, as the Board points out. Thus, the extent of Board involvement is adequate to assure us that the settlement "'manifests an administrative determination . . . that some remedial action is necessary to safeguard the public interests . . . .'" *Vantran, supra,* 580 F.2d at 924, quoting *Poole Foundry, supra,* 192 F.2d at 743. Indeed, the settlement in the latter case was reached prior to issuance of a Board complaint and was approved only by

the Regional Director and not by the Board in Washington. 192 F.2d at 741. It is also clear here from the language of the settlement agreement that the Company's promise to bargain was a quid pro quo for the Union's withdrawal of the section 8(a)(5) charge. Unlike the situation in *Vantran,* where the employer dismissed a state court suit against the union in return for withdrawal of the section 8(a)(5) charge, the Company's promise to bargain here was its primary concession. Therefore, it is fair to assume that the parties intended the duty to bargain contained in the settlement to meet Board standards, which means that bargaining would continue for a reasonable period even if the Union lost its majority support.

█ The Company argues that the long period between the Union's initial certification and the commencement of the Company's duty to bargain under the settlement agreement makes this bargaining provision against public policy and that an open-ended obligation to bargain at some indeterminate time in the future is unenforceable. We disagree. We have recently held that the passage of a lengthy period of time does not preclude the Board from issuing a bargaining order as a remedy for a refusal to bargain in good faith. See *Glomac Plastics, Inc. v. NLRB,* 592 F.2d 94 at 101–103 (2d Cir. 1979); *NLRB v. Patent Trader, Inc.,* 426 F.2d 791 (2d Cir. 1970) (en banc). The only distinction between our prior cases and this one is that in *Glomac* and *Patent Trader* there was a formal Board determination that the Company had failed to bargain in good faith, while here the claim was settled without a formal resolution. However, given the strong policy in favor of settlement of unfair labor practice cases, this distinction is immaterial. The Company also contends that the Board's three-year contract bar rule should apply by analogy to this settlement agreement. Under that rule, a union's majority status cannot be challenged during the term of a collective bargaining contract of up to three years in duration. We find the two types of agreement distinguishable. A collective bargaining contract is purely a private agreement between the parties, while the settlement

here was approved by a Board official. Also, settlement agreements generally contain only one basic provision, while collective bargaining contracts are complex agreements governing the entire employment relationship between the parties. Cf. *Pride Refining, Inc. v. NLRB, supra,* 555 F.2d at 458–59. We therefore decline to apply the contract bar rule to settlement agreements.

█ The Company also argues that precluding it on these facts from challenging the Union's majority status undermines the rights of its employees freely to choose their own representatives. However, we dealt with this problem in *Glomac* and *Patent Trader* and the reasoning of those cases applies equally to this situation. In *Glomac,* we stated:

> We were, of course, aware in *Patent Trader* that enforcement of the bargaining order might have the practical effect of forcing the employees to be represented temporarily by an undesired union. However, we were persuaded that "[r]equiring still another Board election in such a situation undermines the central purpose of the National Labor Relations Act, since it gives an employer an incentive to disregard its duty to bargain in the hope that over a period of time a union will lose its majority status." Id. We therefore adopted . . . [the] view, expressed in the earlier panel decision, that "while seeming to protect employee rights" the requirement of a second election "will in the long run serve to erode them." [*N. L. R. B. v. Patent Trader, Inc.,*] 415 F.2d [190] at 204 (Feinberg, J., dissenting in part).

592 F.2d at 102. Thus, we hold that the settlement agreement here is valid and that to comply with it the Company had to bargain for a reasonable time.

█ We also conclude that the Board's finding of bad faith on the part of the Company is supported by substantial evidence. The Company neglected to inform the Union of the termination of the bankruptcy proceeding for a period of four months. The Company then delayed commencement of bargaining for another three

months. Although it appeared to bargain in good faith at the session in October 1975, the Company later decided not to furnish the information it had promised and to discontinue negotiations. The Board was clearly justified in concluding that the Company "temporarily deluded" the Union and did not bargain in good faith. We find strong support in the record for the Board's conclusion that the Company's conduct was "dilatory, deceptive, and finally outright repudiation of its undertaking and obligation to bargain with the Union in good faith . . . ." Accordingly, we grant the Board's application for enforcement of its order.