**STRAUS COMMUNICATIONS, INC., Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

**Nos. 1004; 1162, Dockets 79–4225; 80–4019.**

United States Court of Appeals, Second Circuit.

Argued May 7, 1980.

Decided June 30, 1980.

Jeffrey M. Bernbach, New York City (Sharfman, Shanman & Poret, P. C., New York City, Perrin Moorhead, of counsel), for petitioner-cross respondent.

Lawrence E. Blatnik, Atty., N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Howard E. Perlstein, Atty., N. L. R. B., Washington, D. C., of counsel), for respondent-cross petitioner.

Before FEINBERG, Chief Judge, FRIENDLY and TIMBERS, Circuit Judges.

FEINBERG, Chief Judge:

In *NLRB v. All Brand Printing Corp.*, 594 F.2d 926 (2d Cir. 1979), we considered the effect of a settlement of an unfair labor practice proceeding upon the duration of an employer's obligation to bargain, an issue we described as "rarely litigated." Perhaps

1. National Association of Broadcast Employees and Technicians, AFL–CIO.

we should be chary of such characterizations in the future, for little over a year later we are again faced with the same question. Petitioner Straus Communications, Inc. (the Company) seeks review of a decision and order of the National Labor Relations Board, reported at 246 NLRB No. 137, which found that the Company's withdrawal of recognition from the certified bargaining representative of its employees (the Union)[1] and subsequent refusal to bargain violated Sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. For reasons set forth below, we deny the Company's petition to review and we grant the Board's application for enforcement of its order.

I

The relevant facts are as follows: The Company operates radio station WMCA in New York City. In October 1977, the Union won a representation election in a bargaining unit composed of "producers" employed at the station. The Union was certified as the bargaining representative on January 12, 1978. Two months later, the Union filed a charge with the Board alleging that the Company had made various changes in working conditions without bargaining with the Union. In April 1978, the Board's Regional Director issued a complaint alleging that the Company had unilaterally adopted a fixed work schedule for the unit employees to replace the former flexible schedule, reduced the size of the unit by laying off employees in accordance with the new schedule, and altered the duties of certain unit employees by eliminating substantially all of their "live" guest-booking functions and by redefining the unit by changing the job classification "producer" to "screener," all in violation of the Company's duty to bargain with the Union. A hearing on the complaint began in September 1978. On the same day, the Company and the Union entered into a settlement agreement and so advised Irwin Kaplan, Administrative Law Judge (ALJ). The ALJ made the following statement:

The parties have been given an opportunity to further explore settlement. And it has been brought to my attention that in off the record discussions, the parties apparently have resolved the underlying dispute and other matters.

I have also been told that the charging party intends to make a request to have the charge withdrawn and further that the general Counsel will request of this Judge that . . . the complaint be dismissed.

The ALJ then invited the parties to read the agreement into the record, and the attorney for the Union made the following statement:

Your Honor, the terms of the settlement are that it is mutually agreed that the work week of the producer-screener in plays shall be 40 hours over a period of five days provided . . . however, that with the mutual agreement of the employee and the management, an employee may work a shorter week to be compensated for according to the hours worked.

In addition . . . ., upon the resolution of a collective bargaining agreement between the parties, it is agreed that the union is the exclusive bargaining representative for the employees in a unit described below and the company recognizes the unit . . . as said exclusive bargaining representative.

That unit is all full time and regular part time producer-screeners including the job function of guest booker employed by the employer at radio station WMCA and its facility located at 888 Seventh Avenue, New York, New York excluding office-clerical employees, professionals, guards . . . and supervisors as so defined in the act.

As a condition of employment, all employees referred to in that unit shall thirty days after the date of the execution of a collective bargaining agreement or in the case of new employees, thirty days after the date of hire become members of the unit and remain members in good standing in the union during the term of this agreement.

It is further agreed that management and talent may continue to perform the booking functions to the extent that they currently perform that job function.

The following exchange then occurred between the ALJ and Jeffrey M. Bernbach, the attorney for the Company.

MR. BERNBACH: The only comment I would have, Your Honor, is that there is nothing implicit in the terms read to you by [Union attorney] Mr. MacLachlan that would compel the parties to enter into a collective bargaining agreement.

We are bargaining and we anticipate that we will ultimately arrive at an agreement. But . . . neither party has made any representation hereto that they will enter into one other than through a bargaining process which is currently in effect.

JUDGE KAPLAN: Do I understand that there is an agreement with regard to the limited terms that have been expressed?

MR. BERNBACH: Yes, . . . to be codified in an agreement . . . if and when an agreement is reached.

JUDGE KAPLAN: But . . . by doing so, you have not represented . . . to me that the parties actually have a collective bargaining agreement.

MR. BERNBACH: We don't.

JUDGE KAPLAN: All right.

[D]o I understand that the terms—the terms that the Charging Party [the Union] has just read into the record—whether there is an agreement on those terms?

MR. BERNBACH: There is an agreement on those terms, yes.

The Union's counsel then requested withdrawal of the charge and the Board's General Counsel moved that the complaint be dismissed and the hearing closed. The ALJ responded as follows:

I will say this . . . before . . . I hear additional comment,—by approving the withdrawal and dismissing the complaint, I have not accepted or rejected the terms agreed to by the parties that they have expressed—whereby they have

expressed to me a desire to memorialize these terms.

But in the absence of any evidence that the parties do not intend to comply with their agreement and in that absence of any evidence why this agreement would not effectuate the purposes of the Act, I would be inclined to accept approval of the withdrawal of [the] request and dismissal of the complaint.

I will give you the moment that you asked for before I finally decide the disposition of this case.

The parties conferred for a moment and then renewed their requests. The ALJ then stated:

Hearing no objection, and since it appears to me that the Act will be effectuated, and having no evidence before me that Respondent [the Company] has a history of unfair labor practices—. . . I know of no history—I will accept the request to withdraw and accordingly, . . . the complaint is hereby dismissed.

Thereafter, the Company and the Union held bargaining sessions on October 31, 1978, December 13, 1978 and January 16, 1979. On this last date, the Company was allegedly presented with a petition signed by a substantial majority of the employees in the unit advising the Company that they no longer wished to be represented by the Union. The next day, the Company filed a petition with the Board for a new election.[2] Since then, the Company has taken the position that it is not obligated to recognize and bargain with the Union. On January 29, 1979, the Union filed a charge of refusal to bargain, upon which the Regional Director issued a complaint on March 30, 1979, and an amended complaint on June 11, 1979, alleging that the Company had violated Sections 8(a)(5) and (1) of the Act. The Company admitted that it had withdrawn recognition from the Union but asserted that the Union's certification year had expired on January 12, 1979 and that a majority of Company employees no longer wanted to be represented by the Union. The Company also denied that the settlement agreement described in detail above had the effect of extending the certification year.

In August 1979, the Board's General Counsel moved for summary judgment on the amended complaint, and in November 1979, a three-member panel of the Board issued its decision and order granting the motion. The Board found that "[t]he unequivocal facts show that the compelling consideration for the Union's withdrawal of the charges, i. e., the *quid pro quo* for the withdrawal, was the concessions made by [the Company] in the agreement as well as its attendant commitment to bargain." (Footnote omitted.) The Board concluded, therefore, that "the parties' September 28, 1978, agreement was a settlement agreement which extended the certification year. . . . [A]ccordingly, from the time of the settlement agreement, the parties were entitled to and required to bargain for that portion of the certification year to which the Union still was entitled free of any encumbrances. Because [the Company] withdrew recognition from the Union during the certification year, as extended, it violated Section 8(a)(5) and (1) of the Act." (Footnotes omitted.) The Board required the Company to cease and desist from its unfair labor practices, and entered the usual bargaining order. The Board also added the following:

There should have been bargaining for at least 1 year following the certification, and for a reasonable time after the agreement. The reasonable period of time should compensate for the failure to bargain during any period of the certification year. The certification was issued by the Board on January 12, 1978, and there was no refusal to bargain prior to

---

**2.** This petition was ultimately dismissed by the Board's Regional Director on April 6, 1979. The Company's request for review of the dismissal was later denied as untimely filed.

In addition, on February 27, 1979, the Company filed an unfair labor practice charge against the Union, alleging that the Union had refused to bargain in good faith. This charge was dismissed by the Board's Regional Director on March 29, 1979, and the Company's appeal of the dismissal was later denied.

March 13, 1978, when the unfair labor practice charges were instituted. The record shows that the certification year was interrupted by litigation of the unfair labor practice charges, and that following the agreement, the parties engaged in bargaining sessions on October 31 and December 13, 1978, and January 16, 1979, when Respondent withdrew recognition from the Union on the grounds that the certification year had expired. Therefore, inasmuch as the Union was not accorded a full certification year, we shall extend the certification year "to embrace the time in which . . . the Employer has engaged in its unlawful refusal to bargain," and we shall require Respondent to bargain for that period commencing on the date on which Respondent and the Union resume bargaining and, if an agreement is reached, to embody it in a signed agreement. (Footnote omitted.)

## II

The Company's principal argument to us is that the Board exceeded its authority when it extended the Union's certification year on the basis of a private, "non-Board" settlement that neither manifested a Board determination that remedial action was necessary nor contained an agreement to bargain. To support this proposition, the Company cites *NLRB v. All Brand Printing Corp.*, supra, and such cases as *NLRB v. Vantran Electric Corp.*, 580 F.2d 921 (7th Cir. 1978). In addition, the Company relies on *Pride Refining, Inc. v. NLRB*, 555 F.2d 453 (5th Cir. 1977), in contending that the settlement agreement was essentially an exchange of contract terms and had no effect on the certification year. The Board replies that it properly found the agreement to be a valid settlement agreement, which extended the Union's certification year. The Board argues that *All Brand Printing* supports its view, and that *Vantran* and the other cases relied on by the Company are distinguishable.

As indicated at the outset of this opinion, we only recently canvassed the law in this area in *All Brand Printing*; indeed, we there discussed at length most of the cases cited to us here by the parties. Turning first to the question of the effect of a settlement agreement, we noted that

[t]he Board's own procedures contemplate various kinds of agreements settling unfair labor practice cases. A formal settlement is subject to approval of the Board in Washington, D.C. and "the Board may issue an order requiring the respondent to take action appropriate to the terms of the settlement"; ordinarily, such an agreement also contains "the respondent's consent to the Board's application for the entry" of an enforcement decree in "the appropriate circuit court of appeals." See NLRB Statements of Procedure, Series 8, 29 C.F.R. § 101.9(b)(1). Informal settlement agreements are not subject to Board approval and do not become the subject of a Board order, but they must be approved by a regional director and, in some instances, by an administrative law judge. See id. §§ 101.7, 101.9. A settlement prior to the issuance of a complaint must be informal. After a complaint is issued, the Board prefers a formal settlement, but the Regional Director has discretion to approve an informal settlement prior to commencement of the hearing. After the opening of the hearing, any settlement must be approved by the administrative law judge. The settlement at this stage can be either formal or informal. See id.

The law is clear that an employer must engage in one full year of good faith bargaining with a union following its certification, regardless of any changes in the majority status of the union. See *Brooks v. NLRB* , 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). The purpose of this insulated period is to give collective bargaining time to produce results and to promote stability in industrial relations. If the employer refuses to bargain in good faith during the certification year, the Board has the power to extend or renew the certification year as a remedy for a section 8(a)(5) violation. See *Franks Bros. Co. v. NLRB*, 321 U.S. 702,

64 S.Ct. 817, 88 L.Ed. 1020 (1944); *Glomac Plastics, Inc. v. NLRB*, 592 F.2d 94 at 100–101 (2d Cir. 1979), and cases cited therein. The insulated period has also been applied to an employer's agreement to bargain with a union in settlement of a section 8(a)(5) charge. If the settlement agreement is valid, then the employer must bargain in compliance with it for a reasonable time without regard to whether the union continues to have the support of a majority of the employees. See *Poole Foundry & Machine Co. v. NLRB*, 192 F.2d 740 (4th Cir. 1951), *cert. denied*, 342 U.S. 954, 72 S.Ct. 626, 96 L.Ed. 709 (1952).

594 F.2d at 929. We then analyzed the *Vantran* case at some length, and noted our agreement with the Seventh Circuit that informal agreements should be scrutinized more closely than formal agreements. Upon such close scrutiny, however, we were satisfied that, on the facts of *All Brand Printing*, "the formalities and the extent of Board involvement . ˙. . [were] sufficient to justify giving the settlement agreement binding effect," id. at 930. We also concluded that

> . . . the Company's promise to bargain was a quid pro quo for the Union's withdrawal of the Section 8(a)(5) charge . . . . Therefore, it is fair to assume that the parties intended the duty to bargain contained in the settlement to meet Board standards, which means that bargaining would continue for a reasonable period even if the Union lost its majority support.

Id. at 931.

■ Applying the same analysis here, we do not believe that the facts in this case are sufficiently different from those in *All Brand Printing* to justify a different result. In both cases, the settlement was "surrounded by formalities," id. at 930, and occurred at the time of the hearing before the ALJ, who was informed of the terms of the settlement on the record. In both cases,

the dismissal of the complaint was approved by a representative of the General Counsel of the Board, who in this capacity acted for the Regional Director. Finally, in both cases the ALJ inquired on the record whether there was any objection to a dismissal of the complaint and a closing of the unfair labor practice hearing. In its argument here, the Company makes much—too much—of the ALJ's remark, "I have not accepted or rejected the terms agreed to by the parties." Taken in context, the statement merely illustrates the ALJ's desire not to impose his view of what the substantive terms of the agreement should be. More significant than this remark are the ALJ's statements in granting the motion to dismiss; he observed that it appeared to him "that the Act will be effectuated" and that there was "no evidence" that the Company "has a history of unfair labor practices." The Board characterized the ALJ's action as "approval of the agreement," and this seems a reasonable view.[3] Indeed, as noted above, see 594 F.2d at 929, the Board's rules required such approval. Therefore, as was the case in *All Brand Printing*, "the extent of Board involvement is adequate to assure us that the settlement ' "manifests an administrative determination . . . that some remedial action is necessary to safeguard the public interests. . . ." ' " Id. at 930; see also *Vantran*, 580 F.2d at 924; *Poole Foundry & Machine Co. v. NLRB*, 192 F.2d 740, 743 (4th Cir. 1951), cert. denied, 342 U.S. 954, 72 S.Ct. 626, 96 L.Ed. 709 (1952).

Similarly, we believe that the Board could properly find here that "the compelling consideration for the Union's withdrawal of the charges, i. e., the *quid pro quo* for the withdrawal, was the concessions made by [the Company] in the agreement as well as its attendant commitment to bargain." (Footnote omitted.) The agreement provided that the Union would request withdrawal of its pending unfair labor practice charges. And, contrary to the

---

**3.** We also agree that the Board correctly rejected the Company's argument that the ALJ's "failure to approve or disapprove each substantive term of the agreement rendered the agreement ineffective."

Company's argument to us, some of the terms of the agreement resolved allegations contained in the unfair labor practice complaint. For example, the inclusion of a comprehensive unit description and the use of the term, "producer-screeners," to refer to unit employees effectively disposed of the charge that the Company had unilaterally altered or eliminated duties of unit employees and had redefined the unit. By the same token, the agreement on a fixed 40-hour work week for unit employees mooted the Union's charge that the Company had unilaterally altered work schedules. The Board could reasonably infer that the Union would not have agreed to withdraw its pending charges unless it was satisfied with the resolution of the issues contained in the complaint, including a commitment by the company to bargain. Moreover, the Company clearly stated that:

> We are beginning and we anticipate that we will ultimately arrive at an agreement. But . . . neither party has made any representation hereto that they will enter into one other than through a bargaining process which is currently in effect.

Citing *Pride Refining, Inc. v. NLRB*, supra, the Company also argues that the agreement "principally relates to the terms of a collective bargaining contract rather than endeavoring to settle outstanding unfair labor practice charges in exchange for a promise to continue bargaining." But as already indicated, part of the agreement resolved some of the specific allegations in the complaint. Moreover, the agreement in this case is clearly distinguishable from the one in *Pride Refining*, which was held not

to extend the certification year; the latter contained detailed and specific provisions concerning wages, hours and working conditions to be effective for a stated period. 555 F.2d at 454–55.[4]

In short, we conclude that the Board did not err in applying here the *Poole Foundry* doctrine, which we accepted in *All Brand Printing*: "If a settlement agreement is valid, then the employer must bargain in compliance with it for a reasonable time . . . ." 594 F.2d at 929. It is true that neither the settlement agreement nor the ALJ's statements specifically extended the certification year,[5] thus leaving unclear the exact date on which the obligation to bargain would lapse. This lack of clarity might in some circumstances make it difficult to determine whether that obligation has been met. But that is not the case here. The certification year commenced on January 12, 1978. The Board's order pointed out that "there was no refusal to bargain prior to March 13, 1978, when the unfair labor practice charges were instituted"; that "the certification year was interrupted by litigation of the unfair labor practice charges," which were settled on September 28, 1978; and that the certification year was extended "to embrace the time in which the Employer . . . engaged in its unlawful refusal to bargain."[6] This extension of the certification year, which the Board in its discretion was empowered to order, was obviously inexact, but it just as obviously embraced at least the five days between January 12, 1979, the earliest possible close of the certification period, and January 17, 1979, when the Company announced its refusal to bargain.

---

4. *Pride Refining* was similarly distinguished in *All Brand Printing*, supra, 594 F.2d at 930. The Company also relies on *NLRB v. Key Motors Corp.*, 579 F.2d 1388 (7th Cir. 1978), but that case is inapplicable here, as it was in *All Brand Printing*, for the reasons there stated. 594 F.2d at 930.

5. We are informed that a Directive from the office of the General Counsel should change this practice for the future. The Directive advises that "a non-Board adjustment [should] include the standard certification extension language when the Region concludes that an ex-

tension of the certification year is necessary to remedy an alleged 8(a)(5) violation. In such circumstances, a withdrawal request based on an adjustment should not be approved unless it provides for such an extension." General Counsel Memorandum 78–77, dated November 20, 1978.

6. Quoting from *Pride Refining, Inc.*, 224 NLRB 1353, 1354–55 (1976), enforcement denied on other grounds *sub nom. Pride Refining, Inc. v. NLRB*, 555 F.2d 453 (5th Cir. 1977). See note 4 supra.

The Company also argues that the Board erred in granting summary judgment in favor of the Board's General Counsel. The Company does not dispute the Board's power to employ summary judgment procedure; rather, it urges that "the motion upon which the Board based its decision involved disputed issues of fact going to the very essence of the issues before the Board," and that summary judgment cannot be granted in the face of such issues. But, our review of the record leads us to agree with the Board that there is no dispute regarding the substance of the Union's unfair labor practice charges, the allegations contained in the Regional Director's complaint, or the terms of the settlement agreement. The Company does of course disagree with the conclusions drawn by the Board from these undisputed facts, but that disagreement does not support a challenge to the Board's use of its summary judgment power.

Accordingly, we deny the petition for review and grant the Board's application to enforce its order.